Filed 3/29/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>REYNALDO GONZALEZ GUTIERREZ,<br><br>    Defendant and Appellant. | F074601<br><br>(Super. Ct. No. SF018202A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John S. Somers, Judge.

J. Peter Axelrod, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Lewis A. Martinez and Jennifer Oleksa, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Following the denial of his suppression motion, Reynaldo Gonzalez Gutierrez pleaded no contest to charges of possession of methamphetamine for sale and possession of ammunition by a prohibited person. On appeal, Gutierrez challenges only the trial court's denial of his motion to suppress evidence obtained by the police, after detaining him in connection with the probation search of a third party. Gutierrez argues the detention was unreasonable under the federal Constitution's Fourth Amendment, requiring exclusion of evidence that was a product of the detention. We agree and reverse the judgment. We will remand the matter for further proceedings in the trial court.

## PROCEDURAL HISTORY

Gutierrez was charged by an information filed in the Kern County Superior Court with possession of methamphetamine for sale (count 1; Health & Saf. Code, § 11378) and possession of ammunition, i.e., a "20-gauge shotgun live round," by a prohibited person (count 2; Pen. Code,[1] § 30305, subd. (a)(1)). Gutierrez filed a motion to suppress evidence related to both counts. (§ 1538.5.) After the trial court denied the suppression motion, the parties reached a plea agreement. Pursuant to the agreement, Gutierrez pleaded no contest to both counts and received a stipulated sentence of two years in prison.[2]

## FACTS[3]

At approximately 7:00 p.m. on June 4, 2015, Kern County sheriff's deputies arrived at the residence of Timothy Beltran in Shafter. The deputies came to conduct a

---

[1] Subsequent statutory references are to the Penal Code unless otherwise specified.

[2] More specifically, Gutierrez was sentenced to the middle term of two years on each count, to run concurrently. As part of the plea agreement, various sentence enhancements alleged in the information were dismissed.

[3] The factual record pertains to the evidentiary hearing on Gutierrez's motion to suppress.

2

probation search of Beltran based on his probation terms (which are not reflected in the record). The record discloses no evidence that Beltran had violated or was suspected of violating, the terms of his probation; rather, it appears the deputies were conducting a routine, random probation compliance search of Beltran. Gutierrez, who did not live at Beltran's house, was visiting him at the time.

***Testimony of Sheriff's Deputy James Simmons***

The People called Sheriff's Deputy James Simmons as a witness. Simmons was one of the deputies who responded to Beltran's house that evening, at "approximately 7:00 p.m." Simmons testified that "three to four other deputies" had "actually arrived first and made contact first." Simmons "went there to assist" them, bringing up the rear. Simmons took up a "perimeter position" from which he "had a view of the front door," but he could not see inside the house. He saw the other deputies go up to the front door and speak to someone, whereupon Beltran and Gutierrez "exited the front of the house." Simmons explained: "The other deputies had [Gutierrez] step out, so at that point I broke my perimeter spot and went over and they had him and [Beltran] detained." Simmons testified that Gutierrez "was detained" on account of the probation search relating to Beltran. Simmons could not say whether, prior to being directed to step out in front of the house, Gutierrez had been detained inside the house for any period.

Simmons "conduct[ed] a pat-down search" of Beltran and Gutierrez on the front porch or in the front yard, for purposes of officer safety. Simmons did not detect any type of weapon during the patdowns. Thereafter, "as [the other deputies] searched the house," Simmons "stood outside" with Gutierrez and Beltran. Gutierrez was directed to sit on the front porch. Simmons noted: "[The other deputies] were coming in and out. I believe they were talking to [Beltran], asking him questions and stuff." Simmons acknowledged the deputies had no information or basis to suspect that Gutierrez was involved in illegal activity.

3

Sometime later, perhaps ten minutes or so after the patdown search, Simmons "gathered [identifying] information from [Gutierrez]" and then "conducted a want and warrant check and probation check [on him] through … dispatch via … radio." Simmons said it was possible that Beltran's probation search started at 7:16 p.m. but the record check on Gutierrez was not requested until 7:48 p.m. Simmons testified: "A short time later, [dispatch] gave me a return of basically that [Gutierrez] was on PRCS, which is Post-Release Community Supervision and a form of parole at the county level." Simmons "then conducted a more thorough search of [Gutierrez's] person" and found a wad of cash in one of his front pockets.[4] A car that Gutierrez identified as his was also searched by other deputies.[5]

Simmons testified that he had heard of instances when deputies requesting records checks were told by dispatch that the subject was on PRCS, when in fact that was not the case. Simmons had not personally had this experience previously.

***Testimony of Sheriff's Dispatcher Cheryl Longwith***

The prosecution also called as a witness Cheryl Longwith, a sheriff's dispatcher who was on duty at 7:00 p.m. on June 4, 2015. Longwith testified that she was in communication with the deputies executing a probation search at Beltran's house. Longwith created, in the dispatch system, an "event chronology" or log related to this particular undertaking. The event chronology began at 7:15 p.m., when deputies informed Longwith that they had "stopped a person" or detained someone. Longwith testified, with reference to the event chronology, that at 7:48 p.m., a deputy gave her Gutierrez's "date of birth" and "requested that [she] check this subject" by running him

---

[4]    Testimony at the preliminary hearing, a separate proceeding from the suppression hearing, indicated that Gutierrez had $121 in his pants pocket.

[5]    Testimony at the separate preliminary hearing revealed that a 20-gauge shotgun round, a digital scale, and 0.93 ounces of methamphetamine were found in Gutierrez's car.

4

through the "national crime information database." Longwith eventually informed the deputies that Gutierrez was on active PRCS. The time when Longwith responded was not reflected in the event chronology, but she testified it would have taken her no more than a "[c]ouple minutes" to run the check and give the deputies the relevant information.

During cross-examination, defense counsel showed Longwith a "CJIS" (Criminal Justice Information System) record showing that Gutierrez's PRCS was dismissed in September 2013 (the record was admitted into evidence), almost two years before June 2015, when the probation search of Beltran occurred. Longwith testified that the dispatch system had pulled up a different type of record, not a CJIS record. Longwith was unable to identify the agency or database that generated the record accessed by dispatch. Longwith did not manually crosscheck the record pulled up by the dispatch system against the corresponding CJIS record.

Longwith noted she had no reason to manually check the CJIS database because, at the time, the dispatch system was set up do to that automatically. She testified: "In our computer system, they tried to streamline things so that you're not checking five and six different [databases] for the information. So they have the computers communicate together and they bring it up into one screen. I was always able to depend on that information." Longwith acknowledged that the system broke down at some point, although she did not specify when that occurred. Specifically, "computer support … determined that the [relevant] systems were no longer communicating with each other." In particular, at that point, the dispatch system was not communicating with CJIS, the database used by the probation department to maintain probation and PRCS records. Dispatchers were subsequently instructed—for purposes of improving accuracy when a person's probation or PRCS status was at issue—to manually access CJIS in order to confirm any probationary or PRCS status reflected in the dispatch system.

5

Regarding the record search for Gutierrez, Longwith explained: "I went solely off of [the automated system]. I did not [manually] double check it through CJIS. Had I double checked it through CJIS, I would have seen what you saw and knew that [Gutierrez] was no longer on PRCS." Longwith knew of another dispatcher who had encountered the same problem, in that the dispatch system had generated inaccurate information regarding an individual's PRCS status and the dispatcher had not double checked it through CJIS.

***Testimony of Probation Officer Artemio Pineda***

Kern County Probation Officer Artemio Pineda testified that he had supervised Gutierrez while Gutierrez was on PRCS. Pineda confirmed that Gutierrez was not on PRCS on June 4, 2015; his PRCS was dismissed in September 2013. Pineda clarified that any changes to a supervisee's PRCS status were entered by the probation department directly into the CJIS system, the system used by the probation department to maintain its records.

Pineda was aware of mistakes made by dispatch in ascertaining people's probationary or PRCS status. For example, Pineda had another former supervisee (not Gutierrez) who was also incorrectly identified by dispatch as being on probation when he was not; like Gutierrez, that former supervisee was searched on the basis of the inaccurate information provided by dispatch as well. Pineda stated the wrongful search of his other supervisee had occurred in the 2013-2014 period. Pineda promptly alerted his supervisor about the situation, because he was concerned that mistakes by dispatch were leading to wrongful searches and seizures.

## DISCUSSION

### I.    *Constitutionality of Gutierrez's Initial Detention*

Gutierrez argues his detention from the inception of Beltran's probation search until the point dispatch told the deputies Gutierrez was on PRCS, was unreasonable under

6

the Fourth Amendment to the federal Constitution. He contends the subsequent searches of his person and his car were, in turn, illegal. He argues the evidence obtained as a result of those searches must be suppressed as the product of his unconstitutional detention. We agree with Gutierrez and will reverse the trial court's ruling denying his motion to suppress this evidence.

In deciding whether relevant evidence must be suppressed, we look exclusively to the requirements of the United States Constitution. (*People v. Glaser* (1995) 11 Cal.4th 354, 363 (*Glaser*).) In reviewing a ruling on a suppression motion, we "defer to the trial court's factual findings, express or implied, where supported by substantial evidence." (*Id.* at p. 362.) "In determining whether, on the facts so found [and/or facts that are undisputed], the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment." (*Ibid.;* see *People v. Miranda* (1993) 17 Cal.App.4th 917, 922 [reviewing court independently decides, as a matter of law, the constitutionality of the challenged search or seizure].) The prosecution always bears the burden of justifying, by a preponderance of the evidence, that a warrantless search or seizure falls within a recognized exception to the warrant requirement. (*People v. Williams* (1999) 20 Cal.4th 119, 130; *People v. James* (1977) 19 Cal.3d 99, 106, disapproved on another ground in *People v. Haskett* (1982) 30 Cal.3d 841, 857, fn. 6.) If a seizure is unreasonable under the federal Constitution, evidence obtained as a consequence thereof must be excluded. (*Mapp v. Ohio* (1961) 367 U.S. 643, 655; *Wong Sun v. United States* (1963) 371 U.S. 471, 484-485.)

"The Fourth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, guarantees the right to be free of unreasonable searches and seizures." (*People v. Gallegos* (2002) 96 Cal.App.4th 612, 622.) For purposes of Fourth Amendment analysis, "police 'contacts' or 'interactions' with individuals" include consensual encounters, detentions, and arrests, with consensual

7

encounters being the least intrusive, and arrests the most intrusive, of these contacts. (*Wilson v. Superior Court* (1983) 34 Cal.3d 777, 784, citing *Florida v. Royer* (1983) 460 U.S. 491 (plur. opn.).) Detentions are "seizures of an individual which are strictly limited in duration, scope and purpose, and which may be undertaken by the police 'if there is an articulable suspicion that a person has committed or is about to commit a crime.'" (*Wilson v. Superior Court, supra,* at p. 784.) The police have detained an individual "'if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" (*Michigan v. Chesternut* (1988) 486 U.S. 567, 573.) Those circumstances may include "physical restraint, threat of force, or assertion of authority." (*In re Tony C*. (1978) 21 Cal.3d 888, 895.)

In the instant matter, both parties agree that Gutierrez was detained at the inception of the probation search concerning Beltran and remained so for the duration of the search. Indeed, Deputy Simmons expressly acknowledged that Gutierrez was "detained," explaining that Gutierrez was ordered out of the house, subjected to a patdown search on the front porch or in the front yard, and directed to sit on the front porch for the duration of Beltran's probation search. Simmons testified he stood guard over Gutierrez and Beltran, while other deputies conducted the search.

The exact duration of the detention is unclear. Deputies arrived at Beltran's house at approximately 7:00 p.m. The sheriff's dispatcher testified that she started a log related to the incident at 7:15 p.m., when she was informed the deputies had "stopped" someone. At 7:48 p.m., Simmons asked the dispatcher to run a record check on Gutierrez and, a couple of minutes later, she advised Simmons, albeit wrongly, that Gutierrez was on PRCS. Thus, although the length of the detention is not precisely ascertainable, it appears to be longer than 30 minutes but no more than 50 minutes.

In terms of assessing the legality of Gutierrez's detention, our analysis starts with the landmark case of *Terry v. Ohio* (1968) 392 U.S. 1, 22 (*Terry*). In *Terry*, the federal

8

high court considered "when police may constitutionally 'stop and frisk' individuals in public places without probable cause to arrest or search." (*Glaser*, *supra*, 11 Cal.4th at p. 363; *In re Tony C.*, *supra*, 21 Cal.3d at p. 892 [*Terry* established that "circumstances short of probable cause to make an arrest may justify a police officer stopping and briefly detaining a person for questioning or other limited investigation"].) *Terry* pointed out that such conduct "has not been, and as a practical matter could not be, subjected to the warrant procedure," but rather "must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures." (*Terry, supra,* at p. 20, fn. omitted.) Application of that general standard, in turn, requires courts to identify the government interest allegedly justifying the intrusion and to balance "'the need to search (or seize) against the invasion which the search (or seizure) entails.'" (*Id*. at p. 21.) Furthermore, "in justifying the particular intrusion the police officer must be able to point to *specific and articulable facts* which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (*Ibid*., italics added.)

In *Michigan v. Summers* (1981) 452 U.S. 692 (*Summers*), the federal high court applied the principles enunciated in *Terry* to a detention at a private residence, where police had come to execute a search warrant for narcotics. In *Summers*, when the police arrived, they saw Summers (the defendant in that case) exit the front door of the house and walk down its front steps. They requested his assistance in obtaining entry, but Summers said he had left his keys inside. The police then detained him while they searched the house. After police found drugs in the house and learned Summers owned the house, they arrested and searched him, discovering more drugs on his person. (*Summers*, *supra*, at pp. 692-693, fn. 1.) Extrapolating *Terry*'s holding, *Summers* explained that, when the probable cause standard is inapplicable, the reasonableness of a seizure depends on the "character of the official intrusion and its justification." (*Summers*, *supra*, at p. 701.) The *Summers* court proceeded to evaluate the nature of the

9

intrusion at issue there and its justification, and to consider whether the detention was supported by articulable and individualized suspicion of criminal activity. (*Id*. at pp. 703-704.)

In evaluating the nature of the intrusion, the *Summers* court observed that it was of "prime importance … that the police had obtained a warrant to search [Summers's] house for contraband." (*Summers*, *supra*, 452 U.S. at p. 701.) Summers's statement to police that he had left the house keys inside—indicating that he was in fact a resident or occupant of the house—was also a critical fact in this context. The court explained: "A neutral and detached magistrate had found probable cause to believe that the law was being violated in that house and had authorized a substantial invasion of the privacy of the persons who resided there. The detention of one of the residents while the premises were searched, although admittedly a significant restraint on his liberty, was surely less intrusive than the search itself." (*Ibid*.)

The court also found it significant that "the type of detention imposed here is not likely to be exploited by the officer or unduly prolonged in order to gain more information, because the information the officers seek normally will be obtained through the search and not through the detention." (*Summers, supra,* 452 U.S. at pp. 701-702.) Finally, the court noted that because Summers was detained inside his own residence, the detention "could add only minimally to the public stigma associated with the search itself and would involve neither the inconvenience nor the indignity associated with a compelled visit to the police station [in connection with execution of the search warrant at his house]." (*Id*. at p. 702.)

Turning to the justification for the intrusion (i.e., "the detention of an occupant of premises being searched for contraband pursuant to a valid warrant"), the *Summers* court explained that in assessing the justification, "both the law enforcement interest and the nature of the 'articulable facts' supporting the detention are relevant." (*Summers*, *supra*,

10

452 U.S. at p. 702.) The court identified a number of legitimate government interests applicable to the particular situation: "preventing flight in the event that incriminating evidence is found"; facilitating "the orderly completion of the search" in that residents could open locked doors or containers, thereby limiting the need for forced openings and attendant damage; and "minimizing the risk of harm to the officers." (*Id*. at pp. 702-703.) As for the requisite articulable and individualized suspicion, the court noted: "The connection of an occupant to [a house subject to a search authorized by a search warrant] gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant." (*Id*. at pp. 703-704, fn. omitted.) *Summers* concluded: "Thus, for Fourth Amendment purposes, we hold that a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted."[6] (*Summers*, *supra*, 452 U.S. at p. 705, fns. omitted; see *Bailey v. United States* (2013) 568 U.S. 186, 202 [*Summers* holds that "[d]etentions incident to the execution of a search warrant are reasonable under the Fourth Amendment because the limited intrusion on personal liberty is outweighed by the special law enforcement interests at stake" in that situation]; *Muehler v. Mena* (2005) 544 U.S. 93, 95, 99 [detention of woman who "occupied" house where search warrant for weapons was being executed was categorically reasonable under *Summers*].)

In *Glaser*, *supra*, 11 Cal.4th 354, the California Supreme Court applied *Summers* to a very similar situation. On a dark and stormy night, Glaser, the defendant, arrived at a

---

[6] In *Glaser,* the California Supreme Court clarified that *Summers*'s use of the term "occupant" excludes mere visitors. (*Glaser*, *supra*, 11 Cal.4th at p. 370, citing 2 LaFave, Search and Seizure (2d ed. 1987) § 4.9(e), pp. 309-310, fns. omitted ["'it would seem that the word "occupants" is not to be loosely construed as covering anyone present, but instead is to be interpreted literally'" as applying to persons who actually occupy the relevant premises].)

11

house just seconds before the police, who had a warrant to search the premises for drugs and associated paraphernalia. (*Glaser, supra,* at pp. 360-361.) Glaser was about to open a back gate leading through the backyard to the house, when a plainclothes officer approached him and yelled something. Glaser could not understand what was being said, perhaps on account of the storm or the fact that he had just woken up. It was only some minutes later that he realized the man was an officer, who, by that point, had his gun pointed at Glaser and was ordering him to get on the ground. (*Id.* at p. 361.) Glaser was handcuffed and taken into the house where, based on other factors, he was subjected to a patdown search. Our Supreme Court addressed the validity of only the initial detention of "*two minutes or less,*" that took place outside the house. (*Id.* at pp. 360-361, 367, italics added.)

The *Glaser* court balanced "the extent of the intrusion against the government interests justifying it, looking in the final and dispositive portion of the analysis to the individualized and objective facts that made those interests applicable in the circumstances of the particular detention." (*Glaser, supra,* 11 Cal.4th at p. 365.) In assessing the character of the detention, the court noted that its extreme brevity and out-of-the-way location at "the back gate of a private residence" diminished the level of intrusiveness, while the officer's use of a gun exacerbated it. (*Id.* at pp. 366-367.) The court also noted that because the detention was incidental to the execution of a search warrant, and "there was no evidence of an independent investigatory purpose," it was "not likely to be exploited by the officer or unduly prolonged in order to gain more information" beyond that expected to be obtained through the search. (*Id.* at p. 367.)

As for the government interests potentially justifying the intrusion, they arose from the fact that there was probable cause to believe that criminal drug activity was occurring at the residence, as reflected in the issuance of the search warrant. Specifically, the government interests were: (1) determining whether Glaser, "who appeared to be

12

more than a stranger or casual visitor," was connected to the criminal activity suspected to be occurring at the residence and, (2) ensuring officer safety "at the site of a search for narcotics." (*Glaser*, *supra*, 11 Cal.4th at p. 365.) Regarding the issue of officer safety, *Glaser* observed that when police execute a search warrant at a suspected drug dealer's home, it is reasonable to assume that dealers often have access to firearms. (*Id*. at pp. 367-368.) Thus, the police have a legitimate interest in "determining the identity of a person entering premises being searched" and his connection to the premises, so as to evaluate the level of risk to officer safety. Determining the identity of such a person and his connection to the premises also assists the police in ascertaining whether "there is reason to suspect the person of involvement in criminal activities on the premises" and whether he can be of assistance in facilitating the search of the premises, as authorized by the search warrant. (*Id.* at pp. 367-368.)

The *Glaser* court concluded that the detention of the defendant there was constitutionally reasonable because his attempted entry into the backyard indicated he was either "a resident or familiar visitor" and he was heading into the house where criminal drug activity was suspected and a search for illegal drugs, pursuant to a search warrant, was already underway. (*Glaser, supra,* 11 Cal.4th at p. 369.) In addition, the defendant did not respond when the officer attempted to communicate with him, leaving the officer "no practical choice but to detain [him]," so as to determine his identity and connection to the house. (*Ibid*.) Indeed, given these circumstances, a momentary detention was "virtually unavoidable" to prevent *Glaser* from coming up behind the officers involved in the search authorized by the warrant. (*Ibid*.)

*Glaser* emphasized that "[u]nder *Terry* the touchstone of reasonableness for search or seizure without probable cause is the presence of 'specific and articulable facts' that reasonably warrant the intrusion on personal liberty and privacy." (*Glaser*, *supra*, 11 Cal.4th at p. 374.) *Glaser* concluded that, "[t]he existence of a warrant to search a home

13

for illegal drugs, the presence of an unknown person on the premises when police begin the search, and the officer's inability to immediately determine the person's identity and connection to the premises without effecting a detention, are specific and articulable facts that, on balance, reasonably warrant a detention limited to the time and means needed to resolve the questions of identity and occupancy and to protect the safety of those present while those questions are resolved." (*Id*. at pp. 374-375.) The court thus approved the detention of "two minutes or less" effected for this purpose. (*Id.* at p. 367.)

*Glaser*, however, expressly declined to adopt "a general rule" that when police have a warrant to search a home, "'the mere arrival or presence of someone at the warranted premises, by itself,' justifies a detention for the purpose of determining identity and connection to the searched premises." (*Glaser, supra,* 11 Cal.4th at pp. 373-374.) *Glaser* noted that "[s]uch a blanket approval of detentions in the course of searches would present too great a danger 'of slippage into a guilt by association pattern whereby anyone seen near prospective drug activity becomes fair game for a stop and frisk.'" (*Id*. at p. 374.)

*People v. Hannah* (1996) 51 Cal.App.4th 1335 (*Hannah*) applied *Summers* and *Glaser* to a situation where police arrived at an apartment to execute an arrest warrant (not a search warrant), for a minor. The woman who answered the door consented to the police entering to check whether the minor was present. The defendant and another man were seated in the living room at the time. The officers directed the men to remain seated while they attempted to locate the minor. One of the officers noticed that the defendant appeared to be under the influence of drugs and arrested him.

In evaluating the legality of the defendant's initial detention, the *Hannah* court noted that the "need to detain defendant to protect the police officers is not as compelling as when a search warrant has been issued or when a police officer has a reasonable basis to believe criminal activity is occurring." (*Hannah*, *supra*, 51 Cal.App.4th at p. 1345.) It

14

nonetheless found the detention was reasonable because "[i]t is hard to envision a more minimal intrusion on an individual's right to be free from unlawful seizure than the circumstances of defendant's detention." (*Id*. at p. 1344.) Specifically, the court observed the detention simply entailed a request that the defendant remain seated where he was located and lasted, at most, several minutes; in addition, the defendant was detained inside the residence, which minimized any "embarrassment or stigma associated with the detention." (*Ibid*.)

In *People v. Matelski* (2000) 82 Cal.App.4th 837 (*Matelski*), the court applied *Summers*, *Glaser*, and *Hannah* to the same situation as presented in the instant case, i.e., a detention in the context of a probation search of a third party. In *Matelski*, the police went to a probationer's house to conduct a probation search because the probationer had failed a drug test and was suspected of using drugs. (*Matelski*, *supra*, at p. 841.) The defendants, who were not targets of the search, were walking out of the front door as the police arrived. One of the officers asked the defendants to approach and explained that the probationer was prohibited from associating with convicted felons. The officer then asked the defendants for identifying information in order to determine whether they were convicted felons. The information was relayed to the police dispatcher for a determination of their status and it was discovered that both defendants had outstanding warrants. They were arrested and searched, and drugs and paraphernalia were found in the course of the searches. (*Id*. at pp. 841-842.)

In a two-to-one decision, the *Matelski* majority concluded the 15-minute detention prior to arrest was constitutionally reasonable. The majority explained the detention was brief and relatively private, in that the house was in a remote area. (*Matelski*, *supra*, 82 Cal.App.4th at pp. 841-842.) Furthermore, the majority "emphasize[d] that this was not a suspicionless intrusion." (*Id*. at p. 851.) "Instead, the officers were at the residence to enforce probation terms against [the probationer] because he had flunked a drug test."

15

(*Id*. at p. 852.)  Finally, the majority noted "there was a need to determine [the] defendants' connection to the probationer because the probationer was prohibited by his general terms of probation from consorting with convicted felons."[7]  (*Matelski*, *supra*, 82 Cal.App.4th at p. 850.)

*People v. Rios* (2011) 193 Cal.App.4th 584 (*Rios*) also dealt with a detention in the context of a probation search of a third party.  In *Rios*, the police came to the house of a juvenile probationer to conduct a probation search.  The juvenile probationer had admitted to using methamphetamine and police officers had also previously found drug paraphernalia and gang tagging in the house.  The officers knew that the probationer was prohibited, under his probation terms, from associating with gang members.  Rios was sitting on a couch near the front door when the police arrived, and one of the officers noticed he had gang tattoos on his face and hand.  The officers asked Rios for identifying information but Rios was uncooperative and appeared to reach for a weapon.  Eventually a struggle ensued and a gun fell out of Rios's shirt.  (*Id*. at pp. 589, 595.)  The court assumed Rios was detained from the time the officers entered the house.  The court held the detention was reasonable because the juvenile probationer was prohibited from associating with gang members and Rios appeared to have gang tattoos, whereby the officers were entitled to ascertain his relationship with the probationer.  (*Id*. at p. 595.)

---

[7]      In contrast, the dissenting justice in *Matelski* was of the view that the drugs discovered as a result of the detention should have been suppressed, noting:

> "None of the *Glaser* facts were present here.  There was no search warrant.
> There was no evidence of illegal activity on the premises.  The officers
> could have determined in seconds that the Matelskis were not residents of
> the home.  The detention of the Matelskis was admittedly not for the
> purpose of officer safety.  The situation was not unstable.  There was no
> "'specific and articulable facts" that reasonably warrant[ed] the intrusion on
> personal liberty and privacy.'"  (*Matelski*, *supra*, 82 Cal.App.4th at p. 854
> (dis. opn. of Gaut, J.).)

Turning to the instant case, *Terry*, *Summers*, and *Glaser* make clear that our task is to balance "the extent of the intrusion against the government interests justifying it," and to consider whether the detention was supported by "'articulable and individualized suspicion.'" (*Glaser*, *supra*, 11 Cal.4th at p. 365; see *Summers*, *supra*, 452 U.S. at pp. 703-704.) Here, Gutierrez's detention appears to be moderately intrusive, even if not greatly so. There is no evidence that officers had their guns drawn. On the other hand, Gutierrez was ordered out of the house, subjected to a patdown search on the front porch or in the front yard, and directed to sit on the front porch evidently for the duration of Beltran's probation search, a period ranging from 30 to 50 minutes. During this time, Simmons stood on the porch to guard Beltran and Gutierrez, and other officers went in and out of the house, questioning Beltran about matters related to his probation search.

Furthermore, evidence of an independent investigatory purpose is apparent, in that Simmons had obtained identifying information from Gutierrez and after, or at least well into, the probation search, asked dispatch to check whether Gutierrez was subject to search terms himself. The detention appears to have been unduly prolonged for this purpose, which was unrelated to the probation search of Beltran. Indeed, given that the police were there simply to conduct a probation search of Beltran, they evinced no interest in ascertaining whether Gutierrez lived with Beltran or was merely visiting him. In this respect, the situation is very different from *Glaser*, where the police arrived at a house to execute a search warrant for drugs and had a heightened interest in knowing whether Glaser lived there, but Glaser, when contacted for this purpose, was unresponsive, at least initially, necessitating a momentary detention.

We are mindful that central to the notion of reasonableness under *Terry* is the requirement of "specificity in the information upon which police action is predicated." (*Terry*, *supra*, 392 U.S. at p. 21, fn. 18; see *Glaser*, *supra*, 11 Cal.4th at p. 369 ["We look, that is, to 'the nature of the articulable and individualized suspicion' justifying the

17

detention."].)  Here, however, the detention was not related to a search warrant for the premises; nor is there any evidence that police had reason to suspect that either Beltran or Gutierrez were dangerous, or that a violation of the law had occurred or criminal activity of any kind was afoot, including the use or dealing of drugs.  Simmons in fact candidly admitted that the deputies did not suspect Gutierrez of any wrongdoing.

As for the probation search itself, there is no evidence that Beltran had ever violated his probation or that the instant probation search was anything more than a routine or random probation compliance search.  In this regard, this case is distinguishable from *Matelski* and *Rios*, both of which also involved detentions that took place in the context of probation searches of third parties.  In those cases, the probationers had violated the terms of their probation shortly before the searches at issue took place.  (*Matelski*, *supra*, 82 Cal.4th at p. 841 [search at issue "prompted" by fact that probationer had failed drug test]; *Rios*, *supra*, 193 Cal.App.4th at p. 589 [probationer had admitted to being under the influence of methamphetamine, and drug paraphernalia and gang tagging was found in house].)  Furthermore, the detentions in those cases were found to be reasonable because the police needed information from the detained persons regarding whether they were felons (*Matelski*) or a gang member (*Rios*), in order to determine whether the respective probationers had violated specific probationary terms prohibiting such contacts.  Unlike *Matelski* and *Rios*, here there is no evidence that police detained Gutierrez in order to verify Beltran's compliance with a specific probationary term.

Finally, we turn to the potential justification of officer safety.  Even were we to assume, without deciding, that the need to ensure officer safety justified a limited detention and patdown search of Gutierrez, here the detention continued for approximately 30 minutes or more after Simmons had patted down both Gutierrez and Beltran and determined that each was unarmed.  (See *Terry*, *supra*, 392 U.S. at pp. 19-20

18

[the Fourth Amendment "inquiry is a dual one—whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place"]; *Florida v. Royer*, *supra*, 460 U.S. at p. 500 ["The scope of the detention must be carefully tailored to its underlying justification."].)  The applicable circumstances do not reflect "articulable and individualized suspicion" to justify such an extended period of detention for purposes of officer safety.  (*Glaser*, *supra*, 11 Cal.4th at p. 369; see *Terry*, *supra*, at p. 22 ["inarticulate hunches" and "subjective good faith" on the part of the officer are insufficient to justify "intrusions upon constitutionally guaranteed rights"].)  The circumstances are not analogous, for example, to the situation that prevailed in *Summers* and *Glaser*, where police were executing search warrants (based on a finding of probable cause by a neutral magistrate) in the houses of suspected drug dealers and detained a resident or "familiar visitor," who would reasonably be expected to have access to firearms.  (*Glaser*, *supra*, at p. 369.)  In short, here there were no "'specific and articulable facts'" that reasonably warranted an extended "intrusion on personal liberty and privacy."  (*Id.* at p. 374 [declining to adopt a general rule that the mere presence of someone at warranted premises alone justifies a detention]; see *Florida v. Royer, supra,* at p. 498 [a person "may not be detained even momentarily without reasonable, objective grounds for doing so"].)

Accordingly, we cannot say that the entire period of Gutierrez's detention—from the inception of Beltran's probation search until the deputies were notified by dispatch that Gutierrez was on PRCS—was justified by government interests made applicable to his detention by "individualized and objective facts."  (*Glaser, supra,* 11 Cal.4th at p. 365.)  We conclude that the extended detention at issue here was unreasonable.  Since the detention itself was unlawful, its fruits—i.e., evidence subsequently obtained from Gutierrez's person and car, as well as any statements he made in connection with those

19

searches—must be suppressed.[8] (*United States v. Crews* (1980) 445 U.S. 463, 470; *People v. Loudermilk* (1987) 195 Cal.App.3d 996, 1001.)

## DISPOSITION

The judgment is reversed and the cause remanded with directions to the trial court to: (1) vacate its order denying Gutierrez's suppression motion and enter a new order granting the motion; (2) permit Gutierrez to withdraw his nolo contendere pleas; (3) determine whether the People intend to retry the case; and (4) make such other orders as are necessary and appropriate.


_____

SMITH, J

WE CONCUR:


_____

PEÑA, Acting P.J.


_____

Meehan, J.

---

[8] In light of our conclusion, we need not address Gutierrez's alternative contention that even had the detention been lawful, the products of the searches of Gutierrez and his car must nonetheless be excluded because the good faith exception to the warrant requirement does not apply to the deputies' reliance on incorrect information indicating that Gutierrez was on active PRCS.