Filed 4/5/24

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| JAMEAL M. MOSLEY, | C099530 |
| Petitioner, | (Super. Ct. No. 23FE10304) |
| v. | |
| THE SUPERIOR COURT OF SACRAMENTO COUNTY, | |
| Respondent; | |
| THE PEOPLE, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDING in mandate.  Petition granted.  Shauna Franklin, Judge.

Amanda Benson, Public Defender, Kyle Hofmeister and David A. Anguiano, Assistant Public Defenders for Petitioner.

No appearance for Respondent.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Christopher J. Rench and Jamie A. Scheidegger, Deputy Attorneys General for Real Party in Interest.

1

Petitioner Jameal M. Mosley seeks writ review of the denial of his motion to suppress the fruits of successive searches of his car (or rather, a car registered to his wife) and his person.[1]  He argues the trial court erred in finding the warrantless searches were supported by probable cause and reasonable suspicion.  We agree and grant the petition.

## I.  BACKGROUND

On July 19, 2023, the Sacramento County District Attorney filed a felony complaint charging petitioner with unauthorized possession and transportation of a machine gun (Pen. Code, § 32625, subd. (a)),[2] being a felon in possession of a firearm for the benefit of a street gang (§§ 29800, subd. (a)(1), 186.22, subd. (b)(1)) and being a felon in possession of ammunition (§ 30305, subd. (a)(1)).  The complaint further alleged that petitioner had suffered a prior strike conviction.  (§§ 667, subds. (b)-(i), 1170.12.)  The charges stemmed from warrantless searches of petitioner's car and person, which produced a loaded magazine and Glock handgun with automatic switch, respectively.

Petitioner filed a motion to suppress the magazine and handgun, arguing the searches were unsupported by probable cause or reasonable suspicion.  The trial court held a suppression hearing on September 1, 2023.

### A.    Evidence Presented at the Suppression Hearing

The Sacramento County Sheriff's Department received a call concerning a group of men in the parking lot of an apartment complex in Rancho Cordova on July 5, 2023.  The caller said the men were creating a music video, and one of them was holding a handgun.  The caller described the man holding the handgun as thin, approximately 16 to 17 years old, and wearing "all black clothing."  Deputies and detectives from the Gang

---

[1] For convenience, we will refer to the car as petitioner's car.

[2] Undesignated statutory references are to the Penal Code.

Suppression Unit, including Detectives Cole Farrow and Bryan Johnson, responded to the call.

Detectives Farrow and Johnson arrived at the apartment complex at 8:12 p.m. The apartment complex was within territory claimed by the East Side Pirus gang. Farrow saw six men standing around the parking lot. One of them was petitioner, a heavyset man dressed in black. Farrow recognized petitioner from the Sacramento County Sheriff's Department's Known Persons File database.[3] Based upon an earlier review of the Known Persons File, Farrow understood petitioner was a validated member of the East Side Pirus, with a history of firearm arrests, and a conviction for being a felon in possession of a firearm (§ 29800, subd. (a)(1)). Farrow also recognized D.M., a juvenile, from a recent traffic stop. D.M. was wearing a black jacket and blue jeans.

The group was instructed to put their hands in the air. D.M. immediately took off running but was apprehended within two minutes. A search of D.M.'s person revealed he was carrying a firearm. A search of D.M.'s car revealed another firearm. All members of the group—including petitioner—were detained.

By now, it was approximately 8:22 p.m., and an active investigation was underway. According to Detective Farrow, the investigation encompassed "a lot of tasks and duties." These tasks and duties included records checks for all members of the group, including checks of the Known Persons File database, which revealed that all were members of the East Side Pirus.

Deputies and detectives also ran the serial numbers on the firearms found on D.M.'s person and car. They determined that one of the members of the group was on

_____

[3] Detective Farrow had had no previous contact with petitioner.

parole and searched that member's car.[4]  They spoke with apartment complex employees and one another.  They added the names of the people they spoke with "into the call."

In the meantime, petitioner was (presumably) patsearched, and was handcuffed and detained in the front seat of a patrol car in the parking lot.[5]  Detective Johnson spoke with petitioner and learned he had driven himself to the apartment complex in his wife's car, which was parked approximately 20 feet away.  Johnson twice asked petitioner for permission to search the car.  Petitioner twice declined.  Johnson's interaction with petitioner consumed between five and 10 minutes.

Detectives Farrow and Johnson searched petitioner's car at 8:53 p.m.  They found a loaded magazine on the front right floorboard.  They then searched petitioner again.  This time, they found a Glock handgun with a switch.  Petitioner was placed under arrest.  He had been detained for approximately 41 minutes.

During the hearing on the motion to suppress, Detective Farrow suggested the decision to search petitioner's car was based on several factors.  First, Farrow testified that he had been a member of the Gang Suppression Unit for several months and had been involved in numerous investigations related to gang activity, the "vast majority" of which involved firearms.  Second, he pointed to petitioner's status as a validated member of the East Side Pirus, and the location of the apartment complex within gang territory.  Third, he said he had personally watched over 100 music videos made by gang members and, in his experience, such videos commonly involve firearms or firearm-related accessories such as holsters, magazines, or ammunition.  According to Farrow, firearms

---

[4] The record does not reveal what, if anything, they found.

[5] The testimony at the motion to suppress hearing was ambiguous as to the circumstances surrounding the initial patsearch.  Neither Detective Farrow nor Johnson testified to conducting the initial patsearch, but no one denies the patsearch occurred and revealed nothing of evidentiary value.

and firearm-related accessories are used in music videos to "pose as a threat to rival gangs or to show the power and dominance of that gang." Fourth, Farrow said gang members frequently hide firearms in their cars. Finally, he said he was familiar with defendant's criminal history.

### B.     *The Trial Court's Ruling*

The trial court found the detectives had the right to detain petitioner, given he met some of the descriptors given by the caller. Specifically, the trial court observed the person with the gun was described as young and thin and wearing all black, and the petitioner, though older and heavier, was dressed all in black, while D.M. was only partly dressed in black.[6]

The trial court next considered the length of the detention, stating: "The 41-minute detention, given what the officers testified about, they indicated they were talking to witnesses that were coming out of the apartment complex. [¶] They were—had to detain all six. They had to run and chase [D.M.]. They placed [D.M.] under arrest. They searched [D.M.'s] car. That, given all of the duties that they were doing at that time, the Court does not find it to be a prolonged detention."

The trial court next considered whether the detectives had probable cause to search petitioner's car. The trial court answered that question in the affirmative; noting, again, that petitioner partly matched the description of the person with the gun. The trial court also noted that petitioner was known to have a criminal history involving firearms and gang ties. Accordingly, the trial court found there was probable cause to search the car, "which led to the magazine, which then led to a proper arrest of [petitioner], and the firearm was found subject to arrest." The trial court thus denied the motion to suppress.

Petitioner filed a timely petition for writ of mandate.

---

[6] The record elsewhere indicates that petitioner was 30 years old at the time of the incident and weighed approximately 300 pounds.

## II.  DISCUSSION

Petitioner argues the trial court erred in denying his motion to suppress. Specifically, he argues law enforcement lacked probable cause to search his car, and his detention was unduly prolonged.  We agree.

*A.      Standard of Review*

The Fourth Amendment guarantees the right to be free from unreasonable searches and seizures.  (U.S. Const., 4th Amend.)  Warrantless searches are per se unreasonable, "subject to only a few specifically established and well-delineated exceptions."  (*Katz v. United States* (1967) 389 U.S. 347, 357.)  When a defendant files a motion to suppress evidence seized in a warrantless search, "the prosecution bears the burden to prove police conducted the search under a valid exception to the Fourth Amendment's warrant requirement."  (*People v. Espino* (2016) 247 Cal.App.4th 746, 756; see *People v. Gutierrez* (2018) 21 Cal.App.5th 1146, 1152 ["The prosecution always bears the burden of justifying, by a preponderance of the evidence, that a warrantless search or seizure falls within a recognized exception to the warrant requirement"].)

On appeal from the denial of a motion to suppress, we defer to the trial court's express or implied factual findings if supported by substantial evidence, but independently apply constitutional principles to the trial court's factual findings in determining the legality of the search.  (*People v. Redd* (2010) 48 Cal.4th 691, 719.)  Here, the underlying facts are largely undisputed.  Therefore, we need only determine whether the facts establish an exception to the warrant requirement.  We conclude they do not.

*B.      Probable Cause to Search Car*

Petitioner argues Detectives Farrow and Johnson lacked probable cause to search the car without a warrant.  The People respond that the search was justified under the automobile exception to the warrant requirement.  Petitioner has the better argument.

Under the automobile exception, officers may search a car without a warrant if there is probable cause to believe the vehicle contains evidence of criminal activity or contraband. (*Florida v. Harris* (2013) 568 U.S. 237, 244; *People v. Moore* (2021) 64 Cal.App.5th 291, 297.) Probable cause exists when, under the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." (*Illinois v. Gates* (1983) 462 U.S. 213, 238; see *Wimberly v. Superior Court* (1976) 16 Cal.3d 557, 571 ["probable cause for a search exists when an officer is aware of facts that would lead a [person] of ordinary caution or prudence to believe, and conscientiously to entertain, a strong suspicion that the object of the search is in the particular place to be searched"].) The automobile exception applies to unoccupied parked cars. (*People v. Superior Court (Nasmeh)* (2007) 151 Cal.App.4th 85, 98-101 [police properly searched parked car for evidence of crime under automobile exception].)

The People argue Detectives Farrow and Johnson had probable cause to search the car because petitioner was a validated gang member with a history of firearms arrests and convictions, who partially matched the description of the person said to be waving a firearm in the music video. The People also argue that probable cause was established by petitioner's presence in an area known for gang activity, and the filming of the music video—a medium said to convey messages of dominance and power to rival gangs. These arguments are misplaced, because they focus on probable cause to arrest or detain, rather than probable cause to search.

" '[T]he focus of the arrest inquiry is different from that of the search inquiry.' " (*United States v. Rodgers* (9th Cir. 2011) 656 F.3d 1023, 1028-1029; see also *United States v. Rojas* (5th Cir. 1982) 671 F.2d 159, 165 ["the facts necessary to show probable cause to arrest are not necessarily the same as those required to show probable cause to search"].) Although the probable cause standard governs both inquiries, and the same quantum of evidence is necessary to establish either, "there may be probable cause to

search without probable cause to arrest, and vice-versa." (2 LaFave, Search & Seizure: A Treatise on the Fourth Amendment (6th ed. Oct. 2022 update) § 3.1(b).)

"Probable cause to arrest concerns the guilt of the arrestee, whereas probable cause to search an item concerns the connection of the items sought with crime and the present location of the items." (*United States v. O'Connor* (9th Cir. 1981) 658 F.2d 688, 693, fn. 7; see also *Zurcher v. Stanford Daily* (1978) 436 U.S. 547, 556 ["The critical element in a reasonable search is not that the owner of the property is suspected of a crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought"].) The relevant inquiry, then, is whether Detectives Farrow and Johnson had probable cause to believe evidence of a crime or contraband would be found *in the car*.

The People have a lot to say about what Detectives Farrow and Johnson knew about petitioner, and relatively little to say about their reasons for believing evidence of crime or contraband might be found in the car. Their argument, so far as the car is concerned, boils down to the following: petitioner admitted driving to the apartment complex in the car, gang members frequently hide firearms in cars, and petitioner "could have had time to hide a firearm in his car before detectives arrived on scene." This argument fails.

A finding of probable cause must be supported by objective facts known to the officer at the time of the search. (*People v. Evans* (2011) 200 Cal.App.4th 735, 753.) Here, Detectives Farrow and Johnson knew petitioner drove to the apartment complex in the car and parked 20 feet from the spot where he was standing when they arrived. But the record does not disclose objective facts, known to Farrow and Johnson at the time, which led them to reasonably believe evidence of a crime or contraband would likely be found in the car. There was, for example, no evidence anyone saw petitioner place anything in the car. Nor was there any evidence anyone saw him standing near the car or moving towards the car or away from it. That petitioner was standing within 20 feet of a

8

parked car in a parking lot does not, without more, raise an inference that evidence of crime or contraband might be found inside the car. (See *People v. Leal* (2023) 93 Cal.App.5th 1143, 1152 [finding no probable cause to search defendant's trunk where officers never saw anyone access the trunk, and noting that cases in which probable cause to believe contraband or evidence of a crime will be found in the trunk or other enclosed compartment of a car "often involve situations where officers see the defendant access the area and either place the evidence in the area or remove the evidence from the area," and collecting cases].)

The People rely on Detective Farrow's belief, based on his training and experience in the Gang Suppression Unit, that gang members frequently hide guns in their cars. Although an officer's training and experience may be considered in determining probable cause, they are no substitute for objective facts supporting an inference that evidence of crime may be found in a particular place. (*United States v. Lopez-Soto* (9th Cir. 2000) 205 F.3d 1101, 1105 ["An officer is entitled to rely on his training and experience in drawing inferences from the facts he observes, but those inferences must also 'be grounded in objective facts and be capable of rational explanation' "].) Here, as we have suggested, the only objective facts known to Farrow at the time of the search were that petitioner was a validated gang member who drove himself to the apartment complex in his wife's car. These circumstances were not enough to support a fair probability that evidence of a crime or contraband would be found in the car.

The People also argue that petitioner "had time" to stash a gun in the car. They point to a lapse of 27 minutes between the time the Sacramento County Sheriff's Department received the call for service and the time Detectives Farrow and Johnson arrived at the apartment complex. These 27 minutes, they say, would have given

petitioner ample opportunity to hide a gun in the car.[7]  That may be so, but again, no evidence suggests Farrow or Johnson were aware of information from which they could have reasonably inferred a fair probability that petitioner used that time to conceal evidence in the car.  That petitioner may have had a window of opportunity to place evidence of crime or contraband in the car, and such evidence was ultimately found on the floorboard, may provide some basis for inferring in hindsight that petitioner must have placed the evidence there or the evidence must have belonged to him.  But the mere possibility that petitioner could have placed a gun in the car does not amount to an objective fact, known to Farrow and Johnson at the time, supporting a fair probability evidence or contraband would be found in the car.[8]

Viewing the record independently, and considering the totality of the circumstances, we conclude reasonable officers armed with the information known to Detectives Farrow and Johnson would not have believed they had probable cause to search the car for evidence of a crime or contraband because, at that point, they had no reason to believe such evidence or contraband would be found there.  We therefore

---

[7] Neither Detective Farrow nor Detective Johnson testified the time of the call for service played any part in their decision to search the car, and the People do not explain why they might have believed the call would have prompted petitioner to set about hiding evidence.  There was no evidence, for example, that Farrow and Johnson believed the group filming the music video was monitoring police radio channels and knew law enforcement would be arriving soon.  In the absence of any such evidence, we struggle to understand why the time of the call for service matters here.  Regardless, no evidence suggests Farrow and Johnson were aware of information supporting a fair probability that petitioner used the period preceding their arrival to conceal evidence in the car.

[8] The People also point to evidence that Detectives Farrow and Johnson found guns in D.M.'s car and on his person.  It is not clear how this evidence supports a finding of probable cause to search petitioner's car.  If anything, the gun found on D.M.'s person suggests members of the group did *not* have an opportunity to hide evidence in their cars before Farrow and Johnson arrived.

conclude the automobile exception does not apply, and the search of the car was made without probable cause.

## C.    *Duration and Scope of Detention*

Petitioner next argues Detectives Farrow and Johnson subjected him to an unreasonably long detention, which became a de facto arrest without probable cause. Specifically, petitioner argues Farrow and Johnson reasonably should have realized within minutes of arriving at the apartment complex that he was not the person seen waving the gun, at which point, they should have released him. The People respond that Farrow and Johnson were faced with an active investigation involving numerous suspects and witnesses, and detained petitioner no longer than necessary to perform their "many necessary tasks." Once again, petitioner has the better argument.

A police officer "can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." (*United States v. Sokolow* (1989) 490 U.S. 1, 7.) Reasonable suspicion exists "when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." (*People v. Souza* (1994) 9 Cal.4th 224, 231.) Reasonable suspicion is less than probable cause (*United States v. Arvizu* (2002) 534 U.S. 266, 274), but more than a mere " 'hunch,' " and must be based on "specific reasonable inferences which [an officer] is entitled to draw from the facts in light of his experience." (*Terry v. Ohio* (1968) 392 U.S. 1, 27.)

An investigative detention must be temporary and last no longer than necessary to effectuate its purpose. (*Florida v. Royer* (1983) 460 U.S. 491, 500 ["The scope of the detention must be carefully tailored to its underlying justification"].) Even a temporary detention, though lawful at the outset, may become unlawful if prolonged beyond the time necessary to carry out the purpose for which it was made. (See *Rodriguez v. United*

11

*States* (2015) 575 U.S. 348, 354 [traffic stop may become illegal if prolonged beyond the time reasonably required to complete the officer's duties]; see also *People v. Russell* (2000) 81 Cal.App.4th 97, 101 [an investigative detention "exceeds constitutional bounds when extended beyond what is reasonably necessary under the circumstances that made its initiation permissible"].)

There are no hard and fast rules for distinguishing between investigative detentions and de facto arrests. Instead, we must consider the facts of each case, with a focus on " 'whether the police diligently pursued a means of investigation reasonably designed to dispel or confirm their suspicions quickly, using the least intrusive means reasonably available under the circumstances.' " (*People v. Celis* (2004) 33 Cal.4th 667, 675; see *People v. Russell, supra,* 81 Cal.App.4th at p. 102 ["the question is whether the police diligently pursued a means of investigation reasonably designed to confirm or dispel their suspicions quickly"].) The prosecution bears the burden of showing the detention was reasonable in scope and duration. (*People v. Pearl* (2009) 172 Cal.App.4th 1280, 1288.)

Petitioner does not challenge the circumstances surrounding his initial detention. He instead argues the detention became unlawful after Detectives Farrow and Johnson caught D.M. and found a gun on him. Upon finding the gun on D.M., petitioner suggests, reasonable officers would have concluded their mission was complete, and would not have continued to detain him. We agree.

As previously discussed, Detectives Farrow and Johnson responded to the parking lot of the apartment complex to investigate a call concerning a group of men making a music video, one of whom was holding a gun. The man with the gun was described as thin, approximately 16 to 17 years old, and wearing black clothing. Farrow and Johnson arrived at the apartment complex at 8:12 p.m., prompting one of the men to flee. Farrow and Johnson gave chase and quickly captured him. By 8:14 p.m., they had arrested D.M., a man matching most of the description given by the caller (young and thin, and wearing

a black jacket), and confirmed he was carrying a gun. By 8:22 p.m., they had searched D.M.'s car and found another gun. From that point forward, the reasons for the initial investigative detention were satisfied, and Farrow and Johnson needed an independent reasonable suspicion or probable cause to continue detaining petitioner. (*People v. Brown* (1998) 62 Cal.App.4th 493, 498-499 [an officer may not ordinarily detain a suspect longer than necessary to complete the original purpose of the detention, " 'unless the officer has an independent reasonable suspicion that the [detainee] has committed unrelated offenses' "].)

*People v. Suggs* (2023) 93 Cal.App.5th 1360 (*Suggs*) is instructive. There, a police officer saw the defendant driving a car that displayed only paper plates in violation of Vehicle Code section 5200. (*Suggs, supra,* at p. 1362.) The officer did not see registration or recent purchase documents displayed. (*Ibid.*) He effected a traffic stop and approached the car. (*Ibid.*) Upon approaching the car, the officer saw temporary registration documents attached to the rear window, which satisfied the legal requirements for vehicles with paper plates. (*Ibid*.) Although the original mission of the stop was now complete, the officer questioned the defendant about the purchase of the car, asked the defendant and his passenger for identification, and asked for permission to search the car. (*Id.* at p. 1363.) The defendant refused the search. (*Ibid.*) The officer then returned to his patrol vehicle. (*Ibid.*) When he came back, he said the defendant and passenger both had suspended licenses, the passenger was on probation, and he was going to conduct a probation search. (*Ibid.*) That search uncovered a gun and drugs. (*Ibid.*)

The trial court denied the defendant's motion to suppress, and another panel of this court reversed. (*Suggs, supra,* 93 Cal.App.5th at p. 1362.) The court explained that "the purpose of the stop completely dissipated" when the officer saw the registration documents in the window, "and thus realized that defendant had not committed the Veh[icle] Code violation that was the purpose of the stop." (*Id.* at p. 1364.) "At that

point," the court continued, "[the officer's] initial reasonable suspicion of a Vehicle Code violation as completely dispelled and he had no basis for writing a citation." (*Id.* at p. 1365.) The detention became unlawful when the officer prolonged the stop "by conducting inquiries aimed at finding evidence of criminal wrongdoing separate and apart from the perceived violation." (*Ibid.*) Because the probation search was the product of the unlawfully prolonged detention, the court reversed the denial of the motion to suppress.

We readily acknowledge that *Suggs* is not on all fours with the present case. That case involved a traffic stop with two suspects (*Suggs, supra,* 93 Cal.App.5th at pp. 1362-1363); this one, an investigatory detention with half a dozen suspects. *Suggs* involved an officer's independent observations, which were capable of being immediately confirmed or contradicted. (*Ibid*.) Here, there was a report of criminal activity, presumably by a citizen, which required some investigation to confirm or dispel. Despite these distinctions, the principles set forth in *Suggs* apply equally here.

Once Detectives Farrow and Johnson apprehended D.M. and found the gun, and patsearched petitioner and found nothing (even though petitioner possessed an automatic handgun), they completed their mission and the original justification for the investigative detention "completely dissipated." (*Suggs, supra,* 93 Cal.App.5th at p. 1364.) From that point forward, Farrow and Johnson should have realized their initial reasonable suspicion had been dispelled, and they could not prolong the detention "by conducting inquiries aimed at finding evidence of criminal wrongdoing separate and apart" from the crime to which they responded. (*Id.* at p. 1365 [officer could approach the defendant's car and explain why he was stopped, but could not "prolong the stop by conducting inquiries aimed at finding evidence of criminal wrongdoing separate and apart from the perceived violation"]; see also *People v. Soun* (1995) 34 Cal.App.4th 1499, 1516 ["Patently[,] the permissible purpose of a detention is to investigate the suspicion of criminal activity on which the detention was predicated"].)

14

The People argue the detention was no longer than reasonably necessary to investigate the report of criminal activity. They emphasize that Detectives Farrow and Johnson "encountered a scene with six known gang members and an unknown number of guns." That may be so, and Farrow and Johnson may well have been justified in detaining all members of the group—including petitioner—for a brief period to ensure officer safety. (See *People v. Glaser* (1995) 11 Cal.4th 354, 436 [officers may detain persons for period necessary to protect safety of all present]; see also *People v. Hannah* (1996) 51 Cal.App.4th 1335, 1346 [same].) But they were not free to detain petitioner beyond the time necessary to achieve the original purpose of the detention. That purpose was not to open an investigation into gangs and guns generally. Though Farrow and Johnson may have been specially concerned with gang activity as members of the Gang Suppression Unit, their mission that night was more narrow: to investigate a report of a young and thin man wearing black clothing and holding a gun. As we have said, they found a man answering that description, for the most part, within minutes of their arrival. Having done so, their mission was complete, and their authority to detain petitioner, absent an independent basis therefor, ended. (See *Rodriguez v. United States, supra,* 575 U.S. at p. 354 [authority for seizure ends when tasks tied to the investigation are—or reasonably should have been—completed]; and see *Suggs, supra,* 93 Cal.App.5th at pp. 1365-1366 [traffic stop became unlawful when purpose of the stop completely dissipated and officer then made inquiries aimed at finding evidence of ordinary criminal wrongdoing].)[9]

---

[9] That is not to say that Detectives Farrow and Johnson could not have developed reasonable suspicion of another crime during the detention, which might have allowed them to extend it. (See, e.g., *Arizona v. United States* (2012) 567 U.S. 387, 448 (conc. and dis. opn. of Alito, J.) ["We have held that a detention based on reasonable suspicion that the detainee committed a particular crime 'can become unlawful if it is prolonged beyond the time reasonably required to complete that mission.' [Citation.] But if during the course of a stop an officer acquires suspicion that a detainee committed a different

The People attempt to justify the continued detention by enumerating the many "tasks and duties" Detectives Farrow and Johnson performed at the scene. After apprehending and searching D.M., they launched a broader investigation which included running background checks on the remaining members of the group, interviewing apartment complex employees, and conferring with one another. The trial court found 41 minutes was not an unreasonable span of time in which to complete all such tasks and duties, and we do not necessarily disagree.[10] But that finding does not answer the question posed here. Even assuming Farrow and Johnson performed their tasks and duties as efficiently as possible, they still lacked reasonable suspicion to continue the detention after they determined that D.M. had a gun, and mistakenly determined that petitioner did not. (*United States v. Bey* (3rd Cir. 2018) 911 F.3d 139, 147 [" 'Once reasonable suspicion has been dispelled, even a very brief extension without consent or reasonable suspicion violates the Fourth Amendment' "].) We therefore conclude that the second patsearch, which resulted in the discovery of the gun, was the product of an unlawfully prolonged detention. (*Suggs, supra,* 93 Cal.App.5th at p. 1366.) The motion to suppress should have been granted.

---

crime, the detention may be extended for a reasonable time to verify or dispel that suspicion"].) The People do not suggest Farrow and Johnson developed reasonable suspicion of another crime.

[10] We note, however, that the record is opaque as to what some of these tasks involved. For example, the record does not reveal how many witnesses were interviewed, or whether the apartment complex employees observed the man with the gun. The record is also unclear as to how many officers were involved. Detectives Farrow and Johnson referred to other officers at the scene in their testimony, and the briefing in the trial court indicates there may have been as many as seven. We are not necessarily convinced that the enumerated tasks and duties could not have been performed by a group of eight officers in fewer than 41 minutes. We need not reach this question, however, because we conclude reasonable suspicion was dispelled within 10 minutes of the detention, before most of the tasks and duties could have been performed.

## III.  DISPOSITION

Let a preemptory writ of mandate issue directing the trial court to vacate its order denying petitioner's motion to suppress and enter a new order granting the motion.  The stay entered on November 3, 2023, is lifted.

/S/

_____

RENNER, J.

We concur:

/S/

_____

DUARTE, Acting P. J.

/S/

_____

BOULWARE EURIE, J.