Filed 9/22/25  P. v. Friel CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FIFTH APPELLATE DISTRICT**

| | |
|---|---|
| THE PEOPLE , <br><br> Plaintiff and Respondent, <br><br> v. <br><br> TREVOR JOHN FRIEL, <br><br> Defendant and Appellant. | F088591 <br><br> (Super. Ct. No. CR-23-007357) <br><br><br> **OPINION** |

---

**THE COURT**[*]

APPEAL from a judgment of the Superior Court of Stanislaus County.  Valli K. Israels, Judge.

Lindsey M. Ball, under appointment by the Court of Appeal, for Defendant and Appellant.

Trevor John Friel, in propria persona, for Defendant and Appellant.

---

[*]    Before Hill, P. J., Meehan, J. and Fain, J.[†]

[†]    Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Office of the State Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

On May 3, 2024, a jury convicted defendant Trevor John Friel of resisting an executive officer (Pen. Code,[1] § 69, count I), as a misdemeanor; battery on a police officer (§ 243, subd. (b), count II); and resisting arrest (§ 148, subd. (a)(1), count III). Subsequently, the trial court sentenced defendant to informal probation and ordered him to serve 90 days in county jail. Defendant filed a timely appeal.

On June 12, 2025, appellate counsel filed a brief pursuant to *People v. Wende* (1979) 25 Cal.3d 436, asking this court to independently review the entire record on appeal. On June 23, 2025, defendant filed a supplemental brief alleging numerous errors that occurred during the entirety of his case. Specifically, defendant contends: (1) the patdown and subsequent seizure of his person constituted an unlawful search and seizure under the Fourth Amendment; (2) he received ineffective assistance of counsel when his trial counsel "fail[ed] to challenge [the] prosecution evidence and inconsistent witness testimony[;]" (3) the prosecutor committed misconduct when he presented inconsistent witness testimony and withheld evidence; (4) the trial court improperly denied his multiple *Marsden*[2] motions; and (5) there were multiple jury related errors that

---

[1] All future references are to the Penal Code.

[2] *People v. Marsden* (1970) 2 Cal.3d 118.

2.

prejudiced his case.**3**  Each of these claims lack merit.  Accordingly, we affirm the judgment.**4**

## PROCEDURAL BACKGROUND

On April 9, 2024, the Stanislaus County District Attorney filed a first amended information charging defendant with resisting an executive officer (§ 69, count I) as a misdemeanor; battery on a police officer (§ 243, subd. (b), count II); and resisting arrest (§ 148, subd. (a)(1), count III).**5**

---

**3**　Defendant further contends "[t]he treatment while in custody, including being stripped naked, deprived of basic necessities, and exposed to unsatisfactory living conditions, raises Eighth Amendment concerns."  Because "[a]ppellate jurisdiction is limited to the four corners of the record on appeal," we are unable to address this argument based on the record's silence regarding this specific claim.  (*In re Carpenter* (1995) 9 Cal.4th 634, 646.)

**4**　Defendant further made a motion to "enter a default judgment in his favor due to the Respondent's failure to file a respondent's brief within the required timeframe." However, the Attorney General was not required to file a response because under *Wende* this court must independently review the entire record and address any contentions raised by the defendant.  (*People v. Kelly* (2006) 40 Cal.4th 106, 110 ["Because the defendant in a *Wende* appeal has a right to file supplemental contentions, the Court of Appeal must consider these contentions in the course of disposing of the cause.  [T]he opinion must reflect the contentions and the reasons that they fail."].)  Accordingly, defendant's motion is denied.

**5**　In the initial information, filed on October 16, 2023, the People charged defendant with a felony violation of section 69 (count I) and a misdemeanor violation of section 243, subdivision (b) (count II).  In the first amended information, the People amended count I to reflect a misdemeanor violation of section 69.  Defendant contends "[t]he modification of charges from felony to misdemeanor assault on a peace officer, raises questions to the competency of the arresting officer for ability to rely ably recall the facts [*sic*]"; however, we find it difficult to find any level of prejudice based on the prosecutor reducing a charge from a felony to a misdemeanor.  Therefore, even assuming error existed, defendant will be unable to establish prejudice as a result of this presumed error.

3.

Trial counsel moved to suppress the observations and statements made by law enforcement, and any other evidence obtained as a result of the detention pursuant to section 1538.5. Subsequently, the trial court denied the motion.

On May 3, 2024, the jury convicted defendant on all counts. The trial court then sentenced defendant to informal probation and ordered him to serve 90 days in the county jail. Defendant filed a timely appeal.

Subsequently, appellate counsel filed a *Wende* brief. The brief also included the declaration wherein she attested she advised defendant he could file a supplemental brief within 30 days of the filing of this opening brief. On June 12, 2025, this court sent a letter to defendant indicating that he may "submit[] a letter stating any grounds on appeal that you want this court to consider." Thereafter, on June 23, 2025, this court received defendant's supplemental letter brief.

## STATEMENT OF FACTS

### I. Motion to Suppress Proceedings

#### A. Underlying Facts

On June 19, 2023, probation officer Jose Ramos conducted a planned probation search at a residence in Modesto. Specifically, Ramos was planning on conducting a probation search of Paul Duffell,[6] who was recently released from custody and wore a global positioning device system (GPS). Ramos was "wearing [his] tactical department vest with [the] probation patches on [the] center" and they were clearly visible to other people. He approached the residence and "saw the door was open to the residence, which [he] then approached and immediately saw … Duffell inside the residence." Defendant and another female were also inside the residence. At this point, Ramos "started calling them out."

---

[6] He is referred to as both "Duffell" and "Duffle" throughout the record. We will refer to him as "Duffell" in this opinion.

Defendant was the last individual to exit the residence. As the defendant exited, Ramos "observed a large brown leather sheath hanging from [defendant's] pant belt, which made [him] believe he had a knife on him." The knife sheath was approximately eight-inches long. Ramos asked defendant "to come [his] way, as [he] was going to pat him down for officer safety." Defendant stated, " 'I have my knife here' " and Ramos replied, " 'Do not reach for it[.]' " Defendant then "made a motion as he was going to step away from [Ramos], at which point [Ramos] got a hold of [defendant's] wrist and told him he was being detained at the moment." This caused defendant to "bec[o]me aggressive, started getting, tensing up, at which point he began trying to get loose from [Ramos's] grip." Eventually, Ramos was able to place defendant in handcuffs.

Subsequently, defendant began threatening the officers. Specifically, he stated, " 'You mother[****]er, I'm going to knock you the f[***] out. You better place me under arrest or you're going to find out[.]' " Ramos then attempted to place defendant in the back of his patrol vehicle. However, as Ramos "grabbed [defendant's] left arm … he attempted to get away from [his] grip. [Defendant] was planting his feet on the ground as [Ramos] was walking him to the vehicle, at which point another officer assisted [Ramos] in walking him to the [vehicle]. While enroute to the [vehicle], [defendant] made a rearward swing[7] with his leg, striking [Ramos] on the right thigh."

After the kick, defendant continued to be verbally aggressive. He stated, " 'You [mother****er], I'm going to f[***] you up now[.]' " At this point, Ramos was able to place him inside the vehicle. This was the last time Ramos interacted with defendant.

### B.    Trial Court's Ruling

Subsequently, the trial court denied the motion to suppress. Specifically, the trial court ruled as follows:

---

**7**      Ramos testified a rearward swing means that "[h]e kicked backwards."

"I don't know that [section] 1538.5 is the proper vehicle to challenge the arrest for resisting arrest or violation of … section 69. I don't know whether the lawfulness of the search is something that can be challenged through [section] 1538.5 in this case or the detention.

"I do think that as sitting as the preliminary hearing magistrate judge, I think I do have some obligation to make a finding as to whether or not the officers were acting lawfully. I do find that is the case in *People v. Rios*.[8] I think the [c]ourt upheld the detention of bystanders during the probation search, and there's limited authority to detain those individuals, and I think the facts are also reasonable having observed the knife on the defendant's person."

## II. Trial Evidence

### A. Prosecution Case

On July 10, 2023, probation officer Breihanna Castilleja placed a GPS monitor on Duffell because "[h]e was on [postrelease] community supervision."[9] Probation Officer Monica Jimenez was assigned to supervise Duffell. Duffell "stated he was transient" and provided no residential address to Jimenez.

On July 19, 2023, Jimenez reviewed Duffell's GPS location and it indicated he was at the 604 Thrasher Avenue address in Modesto. At approximately 2:30 p.m., Jimenez and three other probation officers arrived at the residence to perform a probation compliance search of Duffell. The officers were in full uniform, and armed with firearms and pepper spray. Jimenez knocked on the door and Duffell answered. She "advised him that [they] were going to do a probation search. [She] asked him to come outside, and he came outside, and one of the other officers cuffed him." At this point, the officers

---

**8** Although unclear, it appears the trial court was referring to this court's decision in *People v. Rios* (2011) 193 Cal.App.4th 584 (*Rios*), which held that although the defendant was not on probation, the probation officers possessed the authority to detain the defendant, "and, under the situation as it developed, to frisk him for weapons[.]" (*Id.* at p. 600.)

**9** Duffell's terms of supervision included the conditions that he could be subject to, at any time, a search of his person, residence, and any spaces to which he maintained access.

directed everyone to exit the residence—which included a female, three children, and defendant—so that the officers could search the interior.

The female went inside and told defendant to wake up from the couch and exit the residence. He calmly walked out of the residence with his hands up. However, "he had like a knife sheath … hanging from his belt[.]" At this time, defendant was not on postrelease community supervision, probation, or parole. Based on defendant wearing a knife sheath, officers asked him to participate in a patdown search to ensure officer safety; defendant refused and stated he would just "step aside." The officers became concerned that defendant would use the knife against them as he continued to refuse the patdown. At this point, the officers grabbed defendant's arms, removed the knife sheath, and proceeded to place handcuffs on him. Defendant told Ramos, " 'You better f[***]ing put me under arrest, dude, because I'm going to f[***]ing knock you out when you take these off, punk.' " Defendant told Ramos he was going to punch or hit him "maybe three or four" times.

Officers then attempted to move defendant to the patrol vehicle. During this process, defendant's "pulling away, trying to jerk off [Ramos's] arm … planting his feet, kicking his feet." Defendant also kicked Ramos "in the inner groin area on [his] right leg." Eventually, officers were able to place defendant in the patrol vehicle and turned on the air conditioning.

Officers then conducted a search of the residence—which lasted about an hour. Inside the residence, officers observed Duffell's GPS charger in the bedroom with his postrelease supervision paperwork. Defendant "was not under arrest until he physically did that rearward kick on [Ramos]."

**B.     Defense Case**

Defendant testified on his behalf. He testified he lived at the 604 Thrasher Avenue address and had been paying rent for about two years. According to defendant, Duffell

did not live at the residence nor did he sleep overnight there. He would be at the residence "[j]ust long enough to charge his [GPS] … monitor thing and get on his way[.]"

On July 19, 2023, defendant woke up to "a lot of voices outside yelling and then [the female] saying that [he] needed to get up, that there was—that [he] had to leave the house[.]" Defendant willingly left the residence and observed law enforcement outside. Specifically, he testified:

> "When I came outside, I kind of, you know, confused, like, asked, you know, 'What's going on?' And then they're like, 'We're going to pat you down.' And I said, 'No. I'm not on probation. I'm not on parole.' I'd seen who they were, probation, parole. I shouldn't have to worry about that, you know. Being that is I'm not on probation. I'm not on parole. And I told them, 'Hey, I'll step aside, but don't touch me.' And at that point, the three of them grabbed me. [¶]

> "Then they tried to put my hands behind my back in handcuffs forcefully just pushed me out into a cop [vehicle] as I'm telling them the whole time, like, 'I'm not on probation.' I had my foot dug into the ground, sir, telling them, 'I'm not on probation. What are you guys doing to me?' "

Defendant denied kicking Ramos. He also testified the officers made him feel "[v]ery uncomfortable and very violated." Further, when he was placed in the patrol vehicle the air conditioning was turned off during the entirety of the search.

## DISCUSSION

### I.     Defendant's Initial Detention and Subsequent Arrest Was Lawful

Defendant contends the patdown and subsequent seizure of his person constituted an unlawful search and seizure under the Fourth Amendment. We disagree.

#### A.     Applicable Law

In deciding whether relevant evidence must be suppressed, we look exclusively to the requirements of the United States Constitution. (*People v. Glaser* (1995) 11 Cal.4th 354, 363.) In reviewing a ruling on a suppression motion, we "defer to the trial court's factual findings, express or implied, where supported by substantial evidence." (*Id*. at p. 362.) "In determining whether, on the facts so found [and/or facts that are undisputed],

8.

the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment." (*Ibid.*; see *People v. Miranda* (1993) 17 Cal.App.4th 917, 922 [reviewing court independently decides, as a matter of law, the constitutionality of the challenged search or seizure].)  The prosecution always bears the burden of justifying, by a preponderance of the evidence, that a warrantless search or seizure falls within a recognized exception to the warrant requirement.  (*People v. Williams* (1999) 20 Cal.4th 119, 130; *People v. James* (1977) 19 Cal.3d 99, 106, fn. 4, disapproved on another ground in *People v. Haskett* (1982) 30 Cal.3d 841, 857, fn. 6.)  If a seizure is unreasonable under the federal Constitution, evidence obtained as a result of that seizure must be excluded. (*Wong Sun v. United States* (1964) 371 U.S. 471, 484−485; *Mapp v. Ohio* (1961) 367 U.S. 643, 655−656.)

"The Fourth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, guarantees the right to be free of unreasonable searches and seizures." (*People v. Gallegos* (2002) 96 Cal.App.4th 612, 622.)  For purposes of Fourth Amendment analysis, "police 'contacts' or 'interactions' with individuals" include consensual encounters, detentions, and arrests, with consensual encounters being the least intrusive, and arrests the most intrusive, of these contacts. (*Wilson v. Superior Court* (1983) 34 Cal.3d 777, 784, citing *Florida v. Royer* (1983) 460 U.S. 491, 10 (plur. opn. of White, J.).)  Detentions are "seizures of an individual which are strictly limited in duration, scope, and purpose, and which may be undertaken by police 'if there is an articulable suspicion that a person has committed or is about to commit a crime.' " (*Wilson*, at p. 784.)  The police have detained an individual " 'if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' " (*Michigan v. Chesternut* (1988) 486 U.S. 567, 573.)  Those circumstances may include "physical restraint, threat of force, or assertion of authority." (*In re Tony C.* (1978) 21 Cal.3d 888, 895.)

Further, "[i]n conformity with the rule at common law, a warrantless arrest by a law [enforcement] officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." (*Devenpeck v. Alford* (2004) 543 U.S. 146, 152.) "Probable cause exists when the facts known to the arresting officer would persuade someone of 'reasonable caution' that the person to be arrested has committed a crime. [Citation.] '[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts …. ' (*Illinois v. Gates* (1983) 462 U.S. 213, 232.) It is incapable of precise definition. (*Maryland v. Pringle* (2003) 540 U.S. 366, 371.) ' "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt," ' and that belief must be 'particularized with respect to the person to be … seized.' (*Ibid.*)" (*People v. Celis* (2004) 33 Cal.4th 667, 673.)

**B.      Analysis**

**1.      *Defendant was Lawfully Detained***

Here, it is clear from the record that defendant was detained the moment the probation officers told him to submit to a patdown search based on him wearing a large sheath on his belt. Specifically, Ramos testified he "observed a large brown leather sheath hanging from [defendant's] pant belt, which made [him] believe he had an [eight-inch long] knife on him." Ramos then asked defendant "to come [his] way, as [he] was going to pat him down for officer safety." At this point in time, defendant was detained.

In terms of assessing the legality of defendant's detention, our analysis starts with the landmark case of *Terry v. Ohio* (1968) 392 U.S. 1 (*Terry*). In *Terry*, our High Court considered "when police may constitutionally 'stop and frisk' individuals in public places without probable cause to arrest or search." (*People v. Glaser*, *supra*, 11 Cal.4th at p. 363; *In re Tony C.*, *supra*, 21 Cal.3d at p. 892 [*Terry* established that "circumstances short of probable cause to make an arrest may justify a police officer stopping and briefly

10.

detaining a person for questioning or other limited investigation"].) *Terry* pointed out that such conduct "has not been, and as a practical matter could not be, subjected to the warrant procedure," but rather "must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures." (*Terry*, at p. 20.) Application of that general standard, in turn, requires courts to identify the government interest allegedly justifying the intrusion and to balance " 'the need to search [or seize] against the invasion which the search [or seizure] entails.' " (*Id*. at p. 21.) Furthermore, "in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (*Ibid*.)

As it relates specifically to this case, we find the cases of *People v. Matelski* (2000) 82 Cal.App.4th 837, *Rios*, *supra*, 193 Cal.App.4th 584, and *People v. Gutierrez* (2018) 21 Cal.App.5th 1146 (*Gutierrez*) instructive. In *Matelski*, the court considered the reasonableness of a detention in the context of a probation search of a third party. The police went to a probationer's house to conduct a probation search because the probationer had failed a drug test and was suspected of using drugs. (*Matelski*, at p. 841.) The defendants, who were not targets of the search, were walking out the front door as the police arrived. One of the officers asked the defendants to " '[c]ome over here' " and explained the probationer was prohibited from associating with convicted felons. The officer then asked the defendants for identifying information in order to determine whether they were convicted felons. The information was relayed to the police dispatcher for a determination of their status and it was discovered that both defendants had outstanding arrest warrants. They were arrested and searched, and drugs and paraphernalia were found during the course of those searches. (*Id*. at pp. 841−842.)

The *Matelski* court concluded the 15-minute detention prior to arrest was constitutionally reasonable. Specifically, the court explained the detention was brief and relatively private, in that the house was in a remote area. (*People v. Matelski*, *supra*, 82

11.

Cal.App.4th at pp. 849−850.) Further, the court "emphasize[d] that this was not a suspicionless intrusion." (*Id*. at p. 851.) "Instead, the officers were at the residence to enforce probation terms against [the probationer] because he had flunked a drug test." (*Id*. at p. 852.) Finally, the court noted "there was a need to determine [the] defendants' connection to the probationer because the probationer was prohibited by his general terms of probation from consorting with convicted felons." (*Id*. at p. 850.)

Further, this court in *Rios* also dealt with a detention in the context of a probation search of a third party. (*Rios*, *supra*, 193 Cal.App.4th at pp. 589−590.) In *Rios*, the police came to the house of a juvenile probationer to conduct a probation search. The juvenile probationer had admitted to using methamphetamine and police officers had also previously found drug paraphernalia and gang tagging in the house. The officers knew the probationer was prohibited, under his probation terms, from associating with gang members. The defendant was sitting on a couch near the front door when the police arrived, and one of the officers noticed he had gang tattoos on his face and hand. The officers asked the defendant for identifying information, but the defendant was uncooperative and appeared to reach for a weapon. Eventually, a struggle ensued and a gun fell out of the defendant's shirt. (*Id*. at pp. 589−590, 595.) The court assumed the defendant was detained from the time the officers entered the house. The court held the detention was reasonable because the juvenile probationer was prohibited from associating with gang members and the defendant appeared to have gang tattoos, whereby the officers were entitled to ascertain his relationship with the probationer. (*Id*. at p. 595.)

Finally, this court in *Gutierrez* also dealt with the defendant who was detained during a routine probation compliance search of a third party's home. (*Gutierrez*, *supra*, 21 Cal.App.5th at p. 1149.) The defendant was removed from the house, searched for weapons, and directed to sit on the front porch. (*Ibid*.) He was detained for "longer than 30 minutes but no more than 50 minutes" when officers were informed (incorrectly) that

12.

he was on postrelease community supervision. (*Id*. at pp. 1150, 1153.) Officers then performed a more complete search of his person and searched his nearby vehicle. The searches yielded cash, methamphetamine, a digital scale, and ammunition. (*Id*. at p. 1150, fns. 4 & 5.)

This court distinguished the cases of *Matelski* and *Rios* and held that none of the governmental interests present in those cases weighed in favor of detention. (*Gutierrez*, *supra*, 21 Cal.App.5th at pp. 1160−1161.) Further, the court held that the detention was at least moderately intrusive because, while the defendant was not met at gunpoint, he was ordered out of the house, frisked in the front yard or porch, and ordered to remain for 30 to 50 minutes under guard by an officer. (*Id*. at p. 1159.) The public nature of the search and detention contributed to the intrusive nature of the search. (*Id*. at pp. 1154−1155.)

This court in *Gutierrez* also noted that law enforcement's purpose in detaining the defendant after the initial officer safety search was independent of the purpose of the third party probation search—specifically, an officer asked the dispatcher to determine whether the defendant was subject to search terms. (*Gutierrez*, *supra*, 21 Cal.App.5th at pp. 1159−1160.) A testifying officer "candidly admitted that the deputies did not suspect [the defendant] of any wrongdoing." (*Id*. at p. 1160.) Further, the defendant was not a known "resident or 'familiar visitor' " of a search location being searched for drugs "who would reasonably be expected to have access to firearms." (*Id*. at p. 1161.)

Therefore, in light of the absence of governmental interests, the absence of a search warrant, the apparent independent purpose of the detention after the officer safety search, the moderately intrusive nature of the search, and the absence of any evidence suggesting the officers had reason to suspect that the defendant was dangerous or that any criminal activity of any kind was afoot, this court concluded the duration of the defendant's search was unjustified. (*Gutierrez*, *supra*, 21 Cal.App.5th at pp. 1158−1161.)

Here, similar to *Matelski* and *Rios*, Ramos's testimony provided "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant[ed]" the brief patdown search for weapons. (*Terry*, *supra*, 392 U.S. at p. 21.) The federal Constitution permits "a reasonable search for weapons for the protection of the police officer, where he [or she] has reason to believe that he [or she] is dealing with an armed and dangerous individual[.]" (*Terry*, at p. 27.) "The officer *need not* be absolutely certain that the individual is armed" (*ibid.*, italics added), and a patdown search may be conducted where an officer's observations lead the officer "reasonably to conclude in light of his [or her] experience that … the persons with whom he [or she] is dealing may be armed and presently dangerous[.]" (*Id.* at p. 30; see *Pennsylvania v. Mimms* (1977) 434 U.S. 106, 107 [patdown search justified where officer "[f]ear[ed] that the bulge [in the defendant's jacket] might be a weapon"].)

Ramos testified he observed a sheath on defendant's pant belt—"which made [him] believe [defendant] had a knife on him." A sheath is much more specific in nature than a mere "bulge." (See *Pennsylvania v. Mimms*, *supra*, 434 U.S. at p. 107.) Overall, based on the presence of what Ramos believed to be a knife on defendant's person, this permitted Ramos to conduct a patdown search of defendant's person for purposes of officer safety. Without this ability, Ramos would have subjected himself and the other three probation officers to possible serious injury or death. Overall, "[t]he judiciary should not lightly second-guess a police officer's decision to perform a patdown search for officer safety [because t]he lives and safety of police officers weigh heavily in the balance of competing Fourth Amendment considerations." (*People v. Dickey* (1994) 21 Cal.App.4th 952, 957.) The Fourth Amendment has never been interpreted to " 'require that police officers take unnecessary risks in the performance of their duties.' " (*Mimms*, at p. 110.) Accordingly, Ramos's testimony thus pointed to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant[ed]" the brief patdown search for weapons. (*Terry*, *supra*, 392 U.S. at p. 21.)

14.

## 2.  *Defendant Was Lawfully Arrested*

Here, Ramos also had probable cause to arrest defendant for a violation of section 148, subdivision (a)(1).  At the outset, Ramos was "wearing [his] tactical department vest with [the] probation patches on [the] center" and they were clearly visible to other people.  He approached defendant and told him he was going to patdown defendant for officer safety based on him having a knife sheath on his pant belt.  Defendant then "made a motion as he was going to step away from [Ramos], at which point [Ramos] got a hold of [defendant's] wrist and told him he was being detained at the moment."  As stated above, Ramos was legally permitted under *Terry* to temporarily patdown defendant for the purposes of ensuring officer safety.

However, at this point in time, defendant "became aggressive, started getting, tensing up, at which point he began trying to get loose from [Ramos's] grip."  This type of conduct squarely fits within the scope of section 148 because it "is most often applied to the physical acts of a defendant."  (*In re Muhammed C.* (2002) 95 Cal.App.4th 1325, 1329; *Ibid*.  ["For example, *physical resistance*, hiding, or running away from a police officer have been found to violate section 148."  (Italics added.)]  Eventually, Ramos was able to place defendant in handcuffs.  Assuming Ramos's act of placing defendant in handcuffs constituted an arrest,[10] he possessed probable cause to arrest defendant for a violation of section 148, subdivision (a)(1), based on defendant's conduct of being aggressive, tensing up, and attempting to get loose from Ramo's grip.

Accordingly, defendant's initial detention and subsequent arrest was lawful under the Fourth Amendment.

---

[10]  With that being said, it can be argued that Ramos's act of placing defendant in handcuffs did not constitute a de facto arrest.  (See *Haynie v. County of Los Angeles* (9th Cir. 2003) 339 F.3d 1071, 1077 ["A brief … restriction of liberty, such as handcuffing, during a *Terry* stop is not a de facto arrest."]; see also *United States v. Bautista* (9th Cir. 1982) 684 F.2d 1286, 1289 [handcuffing did not convert detention into arrest].)

15.

## II. Ineffective Assistance of Counsel Claim

Defendant further contends he received ineffective assistance of counsel when his trial counsel "fail[ed] to challenge the prosecution evidence and inconsistent witness testimony[.]" Specifically, he references the fact that "Ramos testified [to] alternating statements as to the fact of if there was or was not a knife present at preliminary trial and then jury trial." We again disagree.

### A. Applicable Law

"The standard for showing ineffective assistance of counsel is well settled. 'In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome. (*Strickland v. Washington* (1984) 466 U.S. 668, 694; *People v. Ledesma* (1987) 43 Cal.3d 171, 217.) A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. [The d]efendant thus bears the burden of establishing constitutionally inadequate assistance of counsel. ([*Strickland*,] at p. 687; [citation].) If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. [Citation.] Otherwise, the claim is more appropriately raised in a petition for writ of habeas corpus.' " (*People v. Gray* (2005) 37 Cal.4th 168, 206−207.)

"Such matters as whether objections should be made and the manner of cross-examination are within counsel's discretion and rarely implicate ineffective assistance of counsel." (*People v. McDermott* (2002) 28 Cal.4th 946, 993.) "In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not

16.

appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions." (*People v. Jones* (2003) 29 Cal.4th 1229, 1254.)

**B.      Analysis**

Here, as to Ramos's testimony specifically, trial counsel extensively cross-examined and recross-examined Ramos about his interactions with defendant.  Trial counsel attempted to characterize Ramos's behavior towards defendant as unnecessary in that defendant lacked any criminal history, and that defendant's aggressiveness toward Ramos only began once Ramos unnecessarily attempted to detain him.  This cross-examination strategy is corroborated by trial counsel's statements during his closing argument.  Specifically, he argued the following:

> "My client is then ordered to come outside of his residence.  It is also uncontested that my client, [defendant], who is not on probation, he was not on [postrelease] community supervision, he was not on parole.  Moreover, law enforcement officers had no reason at this point, and I'm talking about that he was involved in any type of criminal activity.  He is inside of his own home and officers are telling him to come outside.  Not for any wrongdoing that he did, but because there's another person that happens to be inside of the house.  [¶]  …  [¶]

> "At this point in time my client is still calm.  He has barely said any words at this point.  Still calm.  Says something along the lines of I'm going to step outside.  He doesn't yell that.  There's no profanity involved in what he just said.  The police officers' response to that, one officer grabs one hand, two officers grab his other hand.  When he says, when my client says I'm going to step aside, at that point it would be unreasonable for you, ladies and gentlemen, to say that he is not being cooperative still.  He's made no indications that he is going to leave the area, that he would mean harm to the probation officers, but they decided to respond to I'm going to step aside with physical force."

Although the jury ended up convicting defendant of a violation of sections 69, 148, subdivision (a)(1), and 243, subdivision (b), this does not equate to ineffective assistance of counsel on the part of trial counsel.  Rather, trial counsel's cross-examination and

subsequent closing argument is indicative of an attorney who fought hard for the interests of his client. Accordingly, defendant is unable to establish he received ineffective assistance of counsel.[11]

## III. Prosecutorial Misconduct Claim

Defendant further contends the prosecutor committed misconduct when he presented inconsistent witness testimony and withheld evidence. We again disagree. First, defendant fails to direct this court to anything in the record that would give rise to a valid prosecutorial misconduct claim. The only citation he makes to the record is on page 200—which we have reviewed, and it is when the prosecutor introduces the body cam footage into evidence. There is nothing in this portion of the record to evidence any misconduct on the part of the prosecutor. Second, defendant's claim is forfeited because he failed to timely object on prosecutorial misconduct grounds. (*People v. Hill* (1998) 17 Cal.4th 800, 820 ["As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety."].) Accordingly, because defendant did not timely complain of the prosecutorial misconduct, the entire claim is forfeited. However, even if the claim was not forfeited, we nonetheless reject defendant's claim of prosecutorial misconduct on its merits.

## IV. Alleged Trial Court Error

Defendant further contends "[t]he trial judge's denial of *Marsden* motions and failure to recuse herself despite potential conflict of interest constitutes judicial error."

---

[11] Defendant also argues he received ineffective assistance of counsel when his trial counsel "refused to sit down and go over all the evidence against [him]." However, the record is silent as to this specific claim. Because "the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged … the claim is more appropriately raised in a petition for writ of habeas corpus' "—if defendant so chooses. (*People v. Gray*, *supra*, 37 Cal.4th at pp. 206−207.)

Specifically, defendant argues a conflict of interest existed because "[J]udge Israelis [*sic*] signed a warrant on an unrelated issue just days before [his] trial … [and her] actions prejudiced the [defendant] and undermined the fairness of the trial."  We again disagree.

### A.       Additional Factual Background

Defendant made four separate *Marsden* motions on the following three dates: December 18, 2023, April 29, 2024, and May 1, 2024.[12]  We describe them in detail below.

#### 1.       *December 18, 2023 Motion*

On December 18, 2023, defendant filed a *Marsden* motion that was heard before Judge Robert B. Westbrook at his section 995 hearing.  The following relevant exchange occurred between defendant and the trial court:

> "[TRIAL COURT]:  I need you to tell me what it is that your attorney has or hasn't done, which you feel—hang on, which you feel is providing you a deficient representation.  Please be as specific as you can. I can't do anything about general feelings or concerns.  I need you to state clearly on the record what it is that you're concerned about.  After hearing your side, I will ask [trial counsel] his side, and then I will make the decision as best I can based on the information that's given to me.

> "What is it that you are concerned about [trial counsel's] representation?

> "[DEFENDANT]:  I got a couple bullet points here.  I mean, he said before my preliminary trial that you feel that [trial counsel] had filed the wrong motion, and I don't know if you said that on the record or off the record, but I heard you say it personally.

> "[TRIAL COURT]:  I said he filed the wrong motion?

> "[DEFENDANT]:  That you believe he filed the wrong motion but to go ahead and proceed with it anyways.  When I asked [trial counsel] before my preliminary hearing just to speak with him for a couple of minutes, I was the first case of the day, but we got a minute or two to go

---

[12]     Defendant made two separate *Marsden* motions on May 1, 2024.

over some kind of case plan or strategy. I was rushed into it saying no, no, no, we're going to do this now, we're going to do this now.

"That being said, you know, [trial counsel] made decisions without consulting me, which ultimately resulted in—that means that [trial counsel] made decisions without consulting me filing paperwork incorrectly, which resulted in extreme prejudice resulting in negative outcome for my trial.

"[Trial counsel] did not object to testimony obtained via illegal search and seizure. We're here for a [section] 995 motion. [Trial counsel] has not provided me with any evidence, and, I mean any evidence at all, and we're six months into the trial, and I haven't seen any evidence at all.

"I have been—constantly, every time I've gone to talk to the guy, in his office or out front here, what do they got? He tells me they got stuff, but nobody is showing me anything, so I need to file a *Brady*[13] motion, and I'm trying to get him to do that. He's reluctant. He doesn't want to do that. He doesn't want to take the steps that's needed. This my life here that I'm fighting for, time in it, at least, and I deserve the right. I'm going to grasp at everything in this fair trial.

"[TRIAL COURT]: So you're referring to the suppression motion, I believe is the only motion that I see that was filed in this case, correct?

"[DEFENDANT]: Correct. I mean, he didn't file grievance on my behalf. I don't believe that [trial counsel] practices criminal law outside of the [p]ublic [d]efender's office.

"[TRIAL COURT]: Well, you're not allowed to if you're working for the county. You're only allowed to work for the county.

"So with regard to that motion, if I said he filed the wrong motion, it didn't inure to any detriment of yours. He filed a motion to suppress, but the arguments that were presented is that, I believe, unlawful use of force against you. That issue cannot be addressed on a suppression motion. That has to be addressed at trial.

"So when I said that the motion didn't apply to this case, that's why. It's actually a defense to the charge, the reasons that he wants to suppress the evidence against you. It's not a probable cause issue. It's an actual defense to the charge. So I think that's, if my recollection is correct, that's why I didn't hear that motion.

---

**13** *Brady v. Maryland* (1963) 373 U.S. 83.

"With regard to making decisions without consulting you, what decisions are those that you're referring to?

"[DEFENDANT]: The motion that was filed this morning and also, you know, am I going to have to go to trial without seeing evidence?

"[TRIAL COURT]: That's my next question. You were at the preliminary hearing, correct?

"[DEFENDANT]: I was at the preliminary hearing.

"[TRIAL COURT]: So I believe the evidence that the People presented to the [c]ourt is what they intend to go to trial with. What evidence are you referring to?

"[DEFENDANT]: Well, any evidence that they're staying with these body cams, you know, that they said they're wearing. And was everybody wearing a body cam that had one on, because any angle could show something different, you know. So if they're not only going to show the angles that are going to work for them, that's not fair. And he's refusing to fight those sort of arguments.

"And he keeps on persuading me to take a deal with the probation department that violated my rights in the first place and the reason I'm here and then wants me to just give up my rights to them in return for all of that, and I don't feel comfortable doing so.

"[TRIAL COURT]: And, ultimately, it's your decision.

"Any other issues you want me to address before I turn to [trial counsel]? You mentioned something about a *Brady* motion. What are you talking about there?

"[DEFENDANT]: The *Brady* motion would be—you know, let me see where I have my notes on that. The *Brady* motion would be to turn over all evidence they plan to use and also if there is any other evidence based on the officer's misconduct for abuse of power or anything like that, you know.

"[TRIAL COURT]: Okay, I think I know what you're talking about, like a *Pitchess*[14] motion or something like are that.

---

[14]    *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

"[DEFENDANT]:  Yeah, a *Pitchess* motion."

At this point, the trial court asked trial counsel to explain his experience as a criminal defense attorney and to respond to defendant's concerns.  Trial counsel stated he had been a public defender since July 2022 and prior to that he "spent about almost two years with [a private law firm] where [he] worked as de facto deputy public defender for the conflict office, and prior to that [he] completed seven months at the Merced County Public Defender's [O]ffice."  He further stated he filed a motion to suppress on defendant's behalf and that he inquired about the existence of body cam footage and Duffell's terms of his postrelease community supervision.  However, as to Duffell's postrelease community supervision conditions, trial counsel had not had the opportunity to review this piece of evidence or share this information with defendant.

Based on this information, the trial court denied the *Marsden* motion.  Specifically, the trial court ruled as follows:

> "So I'm going to go ahead and find at this point that there's no grounds that I can sustain relieving your counsel at this point.  It sounds like he is working diligently, filing extra motions that certainly don't hurt your case, but this court will, that it wasn't in the proper form to litigate those at this point.

> "It sounds like he has an idea about what your defense is.  It sounds like he's doing the investigation that he needs to get, the material he needs to present that defense.

> "So I'm going to go deny your motion to relieve [trial counsel]."

### 2.    *April 29, 2024 Motion*

On April 29, 2024, defendant filed a *Marsden* motion in front of the trial judge the day before jury trial was set to begin.  The following relevant exchange occurred between the trial court and defendant:

> "[TRIAL COURT]:  Do you request that [trial counsel] be relieved as your attorney and then another attorney be appointed to [re]present you?

22.

"[DEFENDANT]: Yeah. One separate from the [p]ublic [d]efender's [o]ffice. Reason being, that is I've failed to come to any resolution with him or his supervisors …. I mean we've just, we aren't seeing eye to eye on which way to go in my case.

"There's facts of the trial. The reporting officer in all three counts against me and the testifying officer in my preliminary hearing testified false or inaccurate statements. And we're not going after that. That's not part of our game plan. And we have one argument for the trial according to [trial counsel]. And that's all that he needs to go with is one argument for the trial.

"This is my life here. This is not we're going go with one argument and we're going to leave out all these other facts that are good facts that we could also argue. No, we're just going to go with one argument he says and that's it.

"And then at my preliminary hearing, I didn't have the cop cam footage. At my [section] 995 motion to suppress that evidence as well, I didn't have the cop cam footage. I still haven't seen all the cop cam footage. I got three DVD's from them that were blank DVD's, but they offered me other DVD's since then, but I could go home and watch them by myself. And it doesn't matter about watching them with my attorney because he's going to go his own route anyways.

"So I have no say-so in this legal defense. And this trial is just, I sit here and I be quiet. And it's my life on the line, and it's these charges are being held against me. And I feel under duress, you know, I do."

Defendant also complained about the length of time it took for his jury trial to commence. Trial counsel again provided the trial court with his qualifications and addressed the allegations set forth by defendant. The court then denied defendant's second *Marsden* motion. Specifically, the court ruled as follows:

"In hearing all this, to the extent that there are conflicts between the statements of [defendant] and [trial counsel] made this morning, I believe that … [trial counsel] had properly represented [defendant] for the following reasons.

"[Trial counsel] has told us about his experience in criminal law. He's told us about his caseload, yet despite that, he has provided investigation into this case. He has found an extra witness …. She's

23.

already been subpoenaed.  She's already been interviewed at least once, if not twice.

"He has filed a [section] 1538.5 motion to suppress.  He has filed a [section] 995 motion to dismiss in this matter.  He has supported [defendant's] right to a speedy trial and tried to adequately prepare for it.

"The failing to come to a resolution would not be necessarily the fault of [trial counsel], assuming that he has talked to the D.A. and tried to come up with a resolution.  But it doesn't sound like there's been a resolution that the two sides can agree upon, and that would not be necessarily the fault of [trial counsel].

"As far as camera footage, that has been provided to the [d]efendant. Defendant has had multiple office meetings with [trial counsel], and it sounds like perhaps even some supervisors.  They have watched some of the—some of the video here.  [¶]  …  [¶]

"[Defendant] is asking for a speedy trial, which means he's going to have less time to prepare.  If you ask for a speedy trial, that means less time.  So when you're asking for time for the [p]ublic [d]efender to meet with you more than a few times, you know, the [p]ublic [d]efender does have many cases.  They're going to devote some—and they have devoted significant time to your case, from what I'm understanding.

"So I'm going to find that [trial counsel] has properly represented [defendant] and would continue to do so if [defendant] will allow him to do so.  I find that any deterioration in the relationship is going—has been occasioned solely by … [d]efendant having unreasonable expectations as far as what his attorney is supposed to do.  [¶]  …  [¶]

"But I don't see why there's any reason in the future he cannot be adequately represented by [trial counsel], if he wants to be.

"Defendant certainly has the right to obtain his own attorney.  He doesn't wish to do that.  The [c]ourt has also explained he has the right to represent himself, if he wishes to man the defense himself.  But otherwise, sir, [trial counsel] has explained to you, he's tried already 11 cases.  He's done several—over 100 preliminary hearings I believe, 100 to 200.  He['s] done one court trial and 11 jury trials.

"He has talked about strategy and what he finds effective in his experience.  So I find that any deterioration in the relationship is being occasioned solely by … [d]efendant.

"I'm going to deny the motion at this point."

### 3. *The May 1, 2024 Motions*

As to the two May 1, 2024 *Marsden* motions, defendant reiterated frustration with trial counsel. However, the trial court found "that any personality conflicts in the relationship have been occasioned solely by … [d]efendant's willfully recalcitrant and defiant attitude" and that "[t]here is no reason why [trial counsel] … cannot adequately represent [defendant], if [defendant] wants to be represented."

### B. Applicable Law

"Settled principles guide our resolution of defendant's claim that the court erred in denying his … *Marsden* motions. Once a defendant is afforded an opportunity to state his or her reasons for seeking to discharge an appointed attorney, the decision whether or not to grant a motion for substitution of counsel lies within the discretion of the trial judge. The court does not abuse its discretion in denying a *Marsden* motion ' "unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel." ' [Citations.] Substantial impairment of the right to counsel can occur when the appointed counsel is providing inadequate representation or when 'the defendant and the attorney have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citation].' " (*People v. Clark* (2011) 52 Cal.4th 856, 912.) "The trial court's determination will not be disturbed on appeal absent a showing that denial of the motion substantially impaired the defendant's right to the effective assistance of counsel." (*People v. Clemons* (2008) 160 Cal.App.4th 1243, 1250.)

### C. Analysis

Here, the trial court (specifically Judge Israels) was *more* than accommodating with respect to defendant's *Marsden* motions. Although defendant argues Judge Israels

possessed a "potential conflict of interest," there is no indication in the record she harbored any animus towards defendant or defendant's case. In fact, Judge Israels allowed defendant to file *three* separate *Marsden* motions over the course of three days—two of which occurred on the same day—and hash out grievances that had already been addressed in prior proceedings. Judge Israels was patient and gave defendant ample opportunity to air out his grievances—even if they lacked merit and were oftentimes repetitive. Based on these facts, we can confidently say that Judge Israels's decision to deny the *Marsden* motions was a proper exercise of judicial discretion.

## V.     **Alleged Juror Errors**

Defendant further alludes to several juror errors, but makes only a reference to page 300 of the reporter's transcript wherein the trial court overruled an objection regarding Ramos's opinion that a knife is capable of piercing his tactical vest. Ramos's opinion is proper because it provides justification for why he believed a patdown search was necessary in the furtherance of executing his law enforcement duties.

Further, defendant argues there existed evidence of juror bias and he lacked the ability to conduct a proper voir dire of the panel. However, when reviewing the record, trial counsel asked extensive questions of multiple prospective jurors. Defendant does not point to anything in the record, nor are we able to ascertain anything within the record to establish juror bias or an inability to properly question the prospective jurors. Overall, these claims lack merit.

## DISPOSITION

The judgment is affirmed.

26.